UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04-CV-727-S

IN RE
COMPUTREX INTERNATIONAL, INC.                        CHAPTER 7
        DEBTOR                          BANKRUPTCY CASE NO. 02-34671


JAMES D. LYON, TRUSTEE                                   APPELLANT
OF THE BANKRUPTCY ESTATE OF
COMPUTREX, INC.

V.


ELAM TRUCKING, JNS TRUCKING, TRUCK
BROKERAGE d/b/a NICOLE'S TRANSPORTATION,
TRIPLE C TRANSPORT, INC., STONIER
TRANSPORTATION GROUP, INC., TB&P EXPRESS, INC.,
B&J TRUCKING, INC., D.L. BOGETTO & SON CARTAGE,
WHEELS ASSURED DELIVERY SYSTEMS, BREAK-A-WAY
TRANSPORTATION, P&J TRUCKING INC., PANTHER I I
TRANSPORTATION, INC.                                    APPELLEES


**MEMORANDUM OPINION**

        This matter is before the court on appeal of the appellant, James D. Lyon, trustee of the

bankruptcy estate of Computrex, Inc.  Trustee Lyon seeks reversal of an Order of the Bankruptcy

Court granting summary judgment to the appellees.  The Bankruptcy Court held that funds in the

amount of $76,302.52, which were deposited into the court's registry account by an entity not a party

to this action, were not property of the debtor's estate and, therefore, that the trustee's security

agreement did not reach those funds.

1

## **FACTS**

The debtor in this case is Computrex International, Inc. ("International"). International was formed in 2001 as a subsidiary of Computrex, Inc. ("Computrex"), and was spun-off as a separate corporation on March 6, 2001. This split resulted in the creation of debts and obligations between Computrex and International. In December of 2001, Computrex's creditors petitioned to commence an involuntary case under Chapter 7 of the Bankruptcy Code and James D. Lyon ("Trustee Lyon") was appointed trustee of Computrex's estate. Trustee Lyon made claims against International prior to International's own bankruptcy proceedings. The parties ultimately settled those claims, creating a debt in favor of Computrex in the amount of $700,000.00. Pursuant to this settlement agreement, Trustee Lyon took a security interest in various types of collateral owned by International.

After the 2001 split, International assumed an already existing contract between Computrex and Dorel Juvenile Group ("Dorel"). In November of 2001, International and Dorel entered into a new contract under which International provided certain logistics and consultation services to Dorel. International negotiated with carriers to provide transportation services for Dorel. These carriers sent invoices, including signed bills of lading naming Dorel as the recipient of their services, to International. International then reviewed the bills for accuracy, bundled them together and forwarded them to Dorel. Dorel paid International 2.5% of its total carrier cost in exchange for providing these services. Under the contract Dorel had two payment options. First, it could pay the carriers directly and pay International's service fee separately. Second, Dorel could pay the entire amount of the invoices, plus the 2.5% service fee, to International. International would then forward payment to the carriers while retaining its own fee.

2

In August of 2002, International filed for bankruptcy.  When Dorel learned that International was no longer paying its carriers, it then stopped paying International and filed an interpleader action in the bankruptcy proceeding.  Dorel paid into the court's registry the sum of $78,259.00, which covered payment for transportation services provided after Dorel began withholding payments from International. Dorel was then released from the proceeding.

The appellees in this action ("the carriers") claim title to the interpleader funds as payment for the services rendered to Dorel.  Trustee Lyon claims an interest in the funds under the security agreement executed in conjunction with the earlier settlement between Computrex and International. The bankruptcy court granted summary judgment in favor of the carriers, holding that the funds were not part of International's bankruptcy estate and that the security agreement did not reach the funds. The court awarded $76,302.52, plus the pro rated interest earned minus the registry fee, to the carriers.  The order also awarded $1,956.48, plus the pro rated interest minus the registry fee, to International's bankruptcy trustee. This latter amount represents International's 2.5% logistics fee. Trustee Lyon now appeals, seeking reversal of the order.

## STANDARD OF REVIEW

The district court sits as an appellate court for review of bankruptcy court decisions. 28 U.S.C. § 158 (a) ("§ 158 (a)").  However, the jurisdiction of district courts to hear appeals from bankruptcy courts is limited.  Pursuant to § 158 (a), "district courts . . . shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . [and] with leave of the court, from other interlocutory orders and decrees . . .." When a district court exercises jurisdiction on appeal from the judgment of a bankruptcy court, it "reviews the bankruptcy court's findings of fact under a clearly erroneous standard but reviews *de novo* the bankruptcy court's conclusions of law." *Nicholson v.*

*Issacman (In re Isaacman),* 26 F.3d 629, 630 (6th Cir. 1994). "Because a grant of summary judgment presents a pure question of law, the district court reviews the bankruptcy court's grant of summary judgment *de novo*." *Stevenson v. J.C. Bradford* & Co. (*In re Cannon*), 277 F.3d 838 (6th Cir 2002).

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party bears the burden of establishing these elements. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548 (1986). Not every factual dispute between the parties prevents summary judgment. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). To preclude summary judgment, the disputed facts must be material, such that "they might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine, such that "if the facts were proven at trial, a reasonable jury could return a verdict for the non-moving party." *Id.* at 2510. In making these determinations, the court views all facts and inferences in a light most favorable to the nonmoving party. *60 Ivy Street Corp.*, 822 F.2d at 1435.

After reviewing the bankruptcy opinion according to the standards set forth above, this court will affirm the Order of the Bankruptcy Court. There is no genuine issue as to any material fact, and the carriers are entitled to judgment as a matter of law.

## DISCUSSION

### I. The registry funds are not part of International's bankruptcy estate.

The controlling issue in this case is whether the registry funds are part of International's estate. As this question is purely one of law, the court will review the bankruptcy decision *de novo*.

*A. Under the express terms of the contract, International lacked the ownership and control necessary to create an equitable interest in the registry funds.*

Section 541 of the Bankruptcy Code defines the property of the debtor's estate.  11 U.S.C. § 541 (2000).  The statutory language begins broadly, including "all legal or equitable interests of the debtor in property." 11 U.S.C.  § 541(a)(1). However, Congress enumerated several exclusions from this generalized definition.  In the case at bar, the Bankruptcy Court appropriately cited one such exception:

> The plain text of 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers. Identical language found in both the House and Senate reports that accompanied passage of the Bankruptcy Code strongly reinforces this plain reading.  *See United States v. Yellin* (*In re Weinsten*), 272 F.3d 39, 43, 45-46 (1st Cir. 2001) (further supporting plain text interpretation of Bankruptcy Code through legislative history). . . . In [a] congressional hypothetical, property is excluded from the estate where the debtor merely receives property in order to deliver it to its intended recipient without any ownership or control over it.

*City of Springfield, Mass. v. Ostrander (In re LAN Tamers),* 329 F.3d 204, 210 (1st Cir. 2003).

In determining whether the registry funds are part of International's bankruptcy estate or whether they fall within the above exception, the court must examine the contract with Dorel.  "The construction, meaning, and legal effect of a written contract are matters of law for the court to decide." *Biber v. Duplicator Sales & Services, Inc.,* 155 S.W.3d 732, 734 (Ky. App. 2004).  An unambiguous written contract must be performed according to its own express terms.  *See id.*

Under the terms of the November 2001 agreement between International and Dorel, the parties' intent is clear: International was Dorel's disbursing agent.  International, serving as a mere delivery vehicle, lacked beneficial title to funds paid to satisfy debts owed to Dorel's carriers.  The payment terms were unambiguous:

> [International] will, on a weekly basis, package freight billing invoices submitted to them after performing an appropriate freight audit.  This package will be presented to [Dorel] each Monday and will be processed and paid by [Dorel]. For those invoices paid directly, by [Dorel], [International] shall invoice carriers separately for its fees for logistical services, with appropriate backup validating its fee.

5

*Agreement,* ¶ 3.  Clearly, Dorel was obligated to pay the carriers for their shipping services.  It could do so directly, opting to pay International's fee separately, or it could choose to pay International the entire amount due to the carriers, including its own 2.5% logistics fee.

Dorel chose this latter option, with International serving as an intermediary.  The Bankruptcy Court properly characterized International's role as that of a conduit.  International lacked the ownership or control necessary to include the funds in the estate. *See In re LAN Tamers,* 329 F.3d at 210.  Nothing in the contract gives International any discretion, dominion or control over these funds.  International was merely authorized to pay the carriers and to retain its own logistics fee. *See Agreement, Exhibit B*, p. 10 (specifying International's fee and defining "total freight expenses" to include "the actual amounts paid by DJG to the carriers") (emphasis added).

Nonetheless, Trustee Lyon argues that International had the opportunity to exercise dominion and control over the funds paid by Dorel to satisfy its carriers' bills.  However, the courts have held that "[t]he opportunity to exercise improper control is not synonymous with the exercise thereof, and sufficient to create an interest of debtor's estate thereto." *In re Hearn*, 49 B.R. 143, 145 (Bankr. W.D. Ky. 1985).  As evidence of International's control and dominion, Trustee Lyon points to the absence of restrictions on the use of the funds. He notes that the contract neither prohibits commingling of funds nor mandates that they be used exclusively to pay the carriers.  However, the fact that International "could have diverted [Dorel's funds] from their intended purpose" is not sufficient to make the funds property of the estate. *Id.*

In the instant case, International did not commingle the funds. In fact, International never had an opportunity to control these funds because they were placed in the court's registry account.

> When the asset at issue is funds in an account, it is necessary to determine the terms
> under which the funds are held. If the debtor's use of the funds is so restricted that

> the debtor cannot control their use, the account may not be property of the estate.
> It has been held that funds may stand in a bank account in the name of the debtor,
> carry the debtor's tax identification number, and still not be property of the estate.

*Branch v. Hill, Holiday, Connors, Cosmopoulos, Advertising (In re Bank of New England Corp.)*,

165 B.R. 972 (Bankr. D. Mass. 1994) (referencing *In re Comprop Investment Properties, Ltd.*, 81

B.R. 101, 102 (Bankr.M.D.Fla.1987)). International's use of the funds was completely restricted as

the funds have never been held in International's name. Therefore, the present situation more

strongly favors excluding the funds from the estate than does the above example.

Additionally, the recent case of *Lyon v. Contech Construction Products, Inc. (In re

Computrex)*, 403 F.3d 807 (6th Cir. 2005) supports the Bankruptcy Court's ruling. Computrex, the

debtor in *Contech*, provided the same processing and payment services to Contech that International

provided to Dorel. Shortly after the involuntary bankruptcy petition was filed against Computrex,

Computrex paid Contech's carriers nearly $4,500,00.00, which had been wired to Computrex from

Contech. Trustee Lyon attempted to recover this money by avoiding the payment as a preferential

transfer. *Id.* at 810. The court of appeals affirmed the district court ruling that the funds were not

part of the estate, noting that Computrex lacked sufficient dominion or control over the funds.[1] The

court determined that "Contech never loaned, or otherwise conveyed any ownership interest in [the

funds]. Rather, the funds Contech transferred to [Computrex] were given with the sole purpose of

thereby allowing [Computrex] to pass the funds on to Contech's carriers." *Id.* at 811. Computrex's

contractual relationship with Contech mirrors that of International's with Dorel. Therefore, both

cases lead to the same conclusion: the funds will not be included in the debtor's bankruptcy estate.

---

[1]Trustee Lyon advises the court that he filed a timely petition for *en banc* review in *Contech*.
This petition was denied on September 9, 2005.

*B. Dorel did not form the requisite intent to transfer title in the registry funds to International.*

While there are no express contract terms restricting International's use of the funds, likewise there are no express terms authorizing International to do anything with the money other than to pay the carriers. When interpreting a contract, "[t]he essential thing is for the court to look at the contract from the standpoint of the parties at the time they executed it, and the purpose they had in so doing." *Collings v. Scheen,* 415 S.W.2d 589, 593 (Ky. 1967). Dorel employed International to audit and bundle its carrier bills. Money given to International, by the very nature of the contractual relationship between Dorel and International, was intended to satisfy Dorel's debt to its carriers. Notably, the agreement explicitly limits International's authority. International "shall have only such authority to act on behalf of [Dorel] as is hereinafter expressly provided or authorized in writing from time to time." *Agreement,* ¶ 2.1. The Bankruptcy Court correctly interpreted the contract by concluding that International was only authorized to use Dorel's money to pay the carriers and to satisfy International's 2.5% service fee.

To resolve similar disputes in other cases, courts have focused on intent to transfer title. *See Boyd v. Kitchen (In re Newpower),* 233 F.3d 922 (6th Cir. 2000). In *Newpower,* the debtor had embezzled funds from a corporation of which he was a shareholder. The court noted that the corporation "never intended to pass title in the appropriated funds to debtor." *Id.* The funds that the debtor embezzled had been appropriated for the purpose of purchasing real estate for the corporation. Thus, the court held that the debtor "had only limited authority to move corporate funds for [the] authorized corporate purposes." *Id.* The same reasoning applies to the case at bar. International had only limited authority to use Dorel's funds for the authorized purpose of paying the carrier bills. In fact, the parties stipulated that International had a contractual obligation to pay the carriers once

Dorel paid International.  *Stipulation* 10.  Dorel's intent was to satisfy its debt to the carriers and to compensate International for the logistics services provided.  Dorel never expressed an intent to transfer title of all the funds to International.  In fact, the situation at bar more directly leads to excluding the funds from the estate than did the situation in *Newpower*.  In *Newpower*, the funds were paid to the company with authorization to the debtor to use the funds for specified purposes.  Dorel did not transfer the funds in question to International.  Instead, Dorel paid the funds into the registry account, clearly demonstrating its lack of intent to transfer title to International.

In analogous situations, the courts have ruled that money held in trust for another is not part of the trustee debtor's bankruptcy estate.  *See In re Cannon*, 277 F.3d 838, 850 (6th Cir. 2000); *Begier v. IRS*, 496 U.S. 53, 58-59 (1990).  The *Cannon* opinion noted:

> Although the bankruptcy code does not define "property of the debtor," section 541(a)(1) provides that the "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(d) further provides: "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

> The Supreme Court has interpreted these statutes as including in a debtor's estate "that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." However, "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"

*Id.* at 849 (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990)). In *Cannon*, the debtor attorney misappropriated funds held in an escrow account for his clients' real estate transactions.  The court determined that the escrow funds were held in trust by the attorney.

The situation at bar is analogous to *Cannon*.  Once International received money from Dorel, it held those funds for the benefit of the carriers until they were paid.  Similarly, Cannon held the

funds in his escrow account for the benefit of his clients and he was bound to use the money for its intended purpose - the real estate deals.  Thus, as in *Cannon*, the funds should be excluded from the debtor's estate.

> *C. The registry funds were not owed to International pursuant to the contract terms.*

Trustee Lyon argues that the registry funds should be part of the bankruptcy estate because Dorel owed that money to International pursuant to their contract.  *See Georgia-Pacific Corp. v. Sigma Serv. Corp.*, 712 F.2d 962 (5th Cir. 1983). While it is true that money due a bankrupt entity under a contract would be included in the estate, that rule is inapplicable here.  In *Georgia-Pacific*, the debtor construction company ("Sigma") agreed to perform contracting services for Georgia-Pacific. In performance of this contract, Sigma employed materialmen to provide the necessary supplies.  Sigma never paid its materialmen, who later raised competing claims to money paid to Sigma by Georgia-Pacific.  The court determined that these payments were properly included in Sigma's bankruptcy estate, basing its decision on the fact that Georgia-Pacific owed Sigma for services rendered under the contract.  *Id.* at 968.

However, these facts are clearly distinguishable from those at bar.  Sigma had a separate contract with its subcontractor materialmen. There were two distinct contracts, the first between Georgia-Pacific and Sigma and the second between Sigma and its materialmen.  The court determined that Georgia-Pacific owed all the money, including the cost of supplies, to Sigma for services rendered under the contract.  *Id.* In contrast, the money in the registry is not due International under the terms of this contract. As already discussed, express language in the contract allowed Dorel to pay its carriers directly.  *Agreement*, ¶ 3. Under the contract with Sigma, Georgia-Pacific could not pay Sigma's materialmen directly.  Georgia-Pacific made payments via checks

jointly payable to Sigma and the materialmen. *Georgia-Pacific,* 712 F.2d at 964-65.  Georgia-Pacific owed the money to Sigma, who then had the responsibility to pay its materialmen under its own contract with these suppliers, who billed Sigma separately.  *Id.* at 965.  Under the terms of the present contract, Dorel was only obligated to pay International its 2.5% fee.  The Bankruptcy Court correctly included 2.5% of the registry funds in International's estate, and that ruling is consistent with *Georgia-Pacific.*  In both cases the debtor's estate included only the money it was due under contract.

<u>II. Computrex's security interest did not attach to the funds in question.</u>

Trustee Lyon claims a direct interest in the registry funds because of the security agreement executed as part of the settlement between Computrex and International.  He claims priority status under the well-established rule that a debt owed to a secured party must be satisfied before any proceeds of the collateral are distributed to unsecured parties.  *See U.S. v. Darnell (In re Darnell),* 834 F.2d 1263, 1265 (6th Cir. 1987).  A security interest becomes enforceable only when it has attached to the collateral, and there are three explicit requirements for attachment. KRS § 355.9-203.  First, value must be given.  Second, the debtor must have rights in the collateral.  Lastly, the debtor must have an authenticated security agreement providing a description of the collateral or the debtor must have possession or control of the collateral pursuant to an agreement.  KRS § 355.9-203.  All parties agree that value passed between Computrex and International.  However, this first requirement is the only one satisfied.

In Part I of this discussion, the court ruled that International did not have rights in the registry funds.  International served merely as a delivery vehicle and, therefore, the debtor obtained no ownership interest or other rights in the funds.  Thus, the second requirement for attachment is not

present. While the absence of any one of the requirements precludes attachment, the court will proceed to discuss the final requirement, which was addressed in the Bankruptcy Court opinion.

The Bankruptcy Court determined that the description of the collateral was insufficient to satisfy the third requirement of attachment. The language of the security agreement indicates that Trustee Lyon's security interest extended to "all inventory, equipment, fixtures, other tangible and intangible personal property and proceeds and products of all of the Collateral." *Security Agreement*, ¶¶ 1.1-1.5. To determine if the description adequately covers the registry funds, it becomes necessary to classify those funds. The Bankruptcy Court accepted the carriers' position that the registry funds were accounts. However, Trustee Lyon posits that they would be more properly classified as a general intangible. This court agrees with the Bankruptcy Court's classification. The registry funds are accounts, which are not covered by the security agreement. An account is defined as a "right to payment of a monetary obligation whether or not earned by performance . . . for services rendered or to be rendered." KRS § 355.9-102 (b)(1)(b.). As already discussed, the funds remitted to the registry represent money owed to the carriers and to International (to the extent of its 2.5% fee) for services rendered.

Relying on *In re Megamarket of Lexington, Inc.*, 207 B.R. 527 (Bankr. E.D. Ky. 1997), Trustee Lyon urges this court to classify the registry funds as a general intangible. *Megamarket,* however, does not control the situation at bar. The collateral in *Megamarket* was a prepaid insurance account, which differs in nature from the registry funds in question. In *Megamarket,* the court eliminated the category of accounts because "the right to a refund of unearned insurance premiums is not a 'right to payment for goods sold or leased or for services rendered . . . .'" *Id.* at 533. On the other hand, the registry funds do fall squarely within the definition of "account."

12

Additionally, the court must reject Trustee Lyon's characterization because the definition of general intangible explicitly excludes accounts. "'General intangible' means any personal property, including things in action, <u>other than accounts</u>, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction." KRS § 355.9-102 (ap) (emphasis added). The funds cannot be both an account and a general intangible.

Trustee Lyon identifies the "inquiry test" as the controlling rule regarding whether a security agreement sufficiently describes collateral. Under this test, a description is adequate "if it puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved." *Nolin Prod. Credit Ass'n v. Canmer Deposit Bank*, 726 S.W.2d 693, 697 (Ky, 1987). As already noted, the security agreement did not include accounts. Therefore, a subsequent lender performing a chattel lien search would have found that the security interest did not extend to the funds in question. Applying the inquiry test, the description does not sufficiently identify the registry funds as the collateral involved. Thus, it fails the third requirement for attachment as well. Trustee Lyon took no security interest in the registry funds.

cc: Counsel of Record

13